Filed 9/11/15  P. v. Stewart CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068075 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1000880) |
| TRAVON STEWART, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, R. Glenn Yabuno, Judge.  Affirmed.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

This case arose from the death of Dakari P., the infant child of defendant Travon Stewart and his girlfriend, K.P. A San Bernardino County Superior Court jury found Travon Stewart guilty of two felonies: (1) assault resulting in the death of a child under eight years of age (hereafter also referred to as child assault homicide) (count 1: Pen. Code,[1] § 273ab, hereafter section 273ab); and (2) willfully causing injury to a child (count 2: § 273a, subd. (a), hereafter section 273a(a)). The jury found to be true a count 2 allegation that Stewart personally inflicted great bodily injury upon Dakari (§ 12022.7, subd. (d).) The trial court sentenced Stewart to 25 years to life in state prison for his conviction of count 1 and imposed but stayed under section 654 a term of four years for his conviction of count 2.

Stewart raises eight contentions on appeal: (1) the court prejudicially erred by failing to sua sponte give a unanimity instruction instructing the jury that it was required to agree unanimously on the facts supporting the child assault homicide charge (count 1); (2) the court's "erroneous instruction on the assault element of the count one offense, coupled with the prosecutor's legally erroneous theory of culpability and the court's inadequate answer to the jury's question on willfulness, violated due process and requires reversal"; (3) the court's failure to instruct the jury on simple assault and aggravated assault as lesser included offenses of count 1 requires reversal; (4) the court abused its discretion by denying Stewart's motion for a mistrial after the prosecutor questioned a defense expert about what Stewart claims was evidence of old rib injuries that was

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

excluded by an in limine ruling; (5) the prosecutor committed misconduct three times and thereby rendered the trial fundamentally unfair; (6) his conviction of child assault homicide must be reversed because the court's instruction under CALCRIM No. 362 relating to consciousness of guilt was a "one-sided instruction" that failed to tell the jury it could rely on evidence of his postincident conduct as a factor tending to prove he was not guilty of that offense; (7) his conviction of child assault homicide must be reversed because section 273ab is "an end run around the due process requirement of proving malice and premeditation in cases where an assault results in the death of a child"; and (8) even if none of the foregoing errors requires reversal when considered separately, the cumulative effect of the errors deprived Stewart of a fair trial.

We affirm the judgment.

## FACTUAL BACKGROUND[2]

A. *The People's Case*

In March 2010[3] K.P. and Stewart were the parents of two children:  two-month-old Dakari and toddler M.P. (together the children).

On March 3, at around 9:00 a.m., K.P. left Stewart alone in their apartment with the children while she went to the grocery store located across the street from the

---

2    The following witnesses testified for the prosecution:  K.P.; Paul Palsson, a firefighter paramedic; Patricia Kellogg, a paramedic; and two medical experts, Dr. Mark Massi and Dr. Steven Trenkle.  Dr. Janice Orphoven, the defense medical expert, testified for the defense.

3    All further dates are to calendar year 2010 unless otherwise specified.

apartment complex. The children were asleep when she left. Before she left, K.P. gave Stewart instructions on how to care for the children. K.P. left the store to return home about 37 minutes after she left the apartment

Dakari awoke while K.P. was gone and started to cry. M.P. then woke up and started to cry so that both children were crying at the same time. Stewart later admitted to the police during a video-recorded and transcribed interview[4] that he "rocked [Dakari] hard" so that the baby would "be quiet." Stewart acknowledged he caused Dakari's head to "go back and forth pretty violently" to the point that Dakari's eyes rolled back. Stewart also acknowledged that he dropped Dakari on the bathroom floor by the toilet after he "rocked" Dakari hard and then bathed him in the bathtub. Dakari cried the entire time he was being bathed. Dakari's breathing was abnormal from the moment Stewart took him out of the tub. Stewart noticed a "knot" on Dakari's head, and he tried to hide it by putting a beanie cap on Dakari's head so that K.P. would not see the injury. He then put Dakari in his crib.

K.P. testified that when she returned home, Dakari was lying in his crib "like he was asleep." K.P. called 911 and Stewart ran into the street to ask for help. When paramedics arrived, Stewart was very hostile and behaved in a threatening manner while screaming out of control. Stewart did not inform K.P. or the paramedics that he had injured Dakari.

---

[4] The video recording of the police interview was played for the jury during trial, and both the recording and the transcript were admitted in evidence. During deliberations, the jury asked to view the video-recording again.

4

Dakari was resuscitated and he regained a pulse before he arrived at the hospital, but he was still unable to breathe on his own and he was placed on a ventilator to keep him alive. The doctors declared Dakari brain-dead the following day, March 4, but he was kept on life support for several more days.

San Bernardino Police Department Detective Anthony King interviewed Stewart. As we shall discuss more fully, *post*, Stewart repeatedly lied by falsely telling the officer that Dakari was his cousin, and he repeatedly lied about how Dakari was injured.

Dakari was taken off of life support on March 8. Dr. Steven Trenkle, a forensic pathologist who performed an autopsy on Dakari, opined Dakari's death was not accidental, but was an intentionally inflicted homicide. Dakari had a four-inch-long skull fracture that ran from the right side parietal bone, which is above the ear, to the occipital bone, which is at the back of the head. The fracture was not a thin fracture. The edges of the fracture had spread apart as a result of significant swelling of the brain. There was bleeding between the dura and the brain, indicating Dakari had suffered a trauma from a "moving head" injury. Dakari had several subarachnoid hemorrhages, which are hemorrhages that are between the brain and the arachnoid membrane. This type of bleeding is typically seen when there has been an impact.

According to the expert testimony of Dr. Mark Massi, a forensic pediatrician, and Dr. Trenkle, Dakari also had hemorrhages around the optic nerve of both eyes, with the hemorrhaging going through multiple layers of his left eye. This type of hemorrhaging typically is seen in trauma deaths. In addition to an impact to Dakari's head that caused the scalp swelling and the break in the skull, some sort of shaking also was involved.

5

The edges of Dakari's retina were folded upward, which is consistent with child abuse where the baby has been shaken. Based on the severity of the retinal hemorrhaging, the presence of a folded retina and blood between multiple layers of the brain, and Stewart's admission that he shook Dakari, the People's medical experts opined that Dakari suffered acceleration-deceleration injuries. Acceleration-deceleration injuries occur when a baby is shaken and the head is made to move through space and the head is speeding up and slowing down and changing direction.

B. *The Defense*

Dr. Janice Orphoven, the defense medical expert, was the only witness who testified for the defense. Dr. Orphoven received training in pediatric forensic pathology and worked in that field. From 2010 to the time of the trial in this matter in January 2013, with the exception of two or three consultations from prosecutors, her work involved testifying and working with the defense in criminal cases. Dr. Orphoven opined that Dakari died from complications from blunt force trauma to his head, and the injury was consistent with his being accidentally dropped four to five feet. She also opined there was no evidence of any shaking.

DISCUSSION

I. *FIRST CLAIM OF COUNT 1 INSTRUCTIONAL ERROR*
*(FAILURE TO GIVE A UNANIMITY INSTRUCTION)*

Stewart first contends his conviction of child assault homicide (count 1) must be reversed because the court prejudicially erred by failing to give, sua sponte, a unanimity

6

instruction informing the jury it was required to agree unanimously on the facts supporting that count. We reject this contention.

A. *Background*

Stewart was charged in count 1 with assault resulting in the death of Dakari, a child under eight years of age (§ 273ab), and in count 2 with willfully causing injury to a child (§ 273a(a)).

As pertinent here, the court instructed the jury under CALCRIM No. 821 that a violation of count 2 included a criminal negligence element:

> "To prove [Stewart] is guilty of this crime, the People must prove that . . . [he] was *criminally negligent* when he caused or permitted the child to be injured." (Italics added.)

The court also instructed the jury under CALCRIM No. 821 on the meaning of the term "criminal negligence": "*Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when: [¶] 1. He or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation; [¶] 2. The person's acts amount to disregard for human life or indifference to the consequences of his or her acts; [¶] [and] [¶] 3. A reasonable person would have known that acting in that way would naturally and probably result in harm to others." (Italics added.)

During her closing argument, the prosecutor told the jury that the People's factual theory of guilt regarding *count 1* was that Stewart shook Dakari and slammed him onto a hard surface, causing his skull to fracture. In her rebuttal argument, the prosecutor focused on the negligence element of *count 2*, not on count 1. The prosecutor argued

7

that, "[a]s far as [Stewart's] negligence goes, it's not just about not calling 9-1-1," he covered Dakari's head injury with a beanie and he never told anybody about the injury.

B. *Applicable Legal Principles*

"[T]he requirement of jury unanimity in criminal cases is of constitutional origin." (*People v. Jones* (1990) 51 Cal.3d 294, 321, citing Cal. Const., art. I, § 16.)  As this court explained in *People v. Muniz* (1989) 213 Cal.App.3d 1508, 1517, "[i]t is well established that the entire jury must agree upon the commission of the same act in order to convict a defendant of the charged offense."

"When an accusatory pleading charges the defendant with a single criminal act, and the evidence presented at trial tends to show more than one such unlawful act, either the prosecution must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)  "The duty to instruct on unanimity when no election has been made rests upon the court sua sponte." (*Ibid*.)

However, under the "continuous conduct" rule a unanimity instruction is not required when "the acts alleged are so closely connected as to form part of one transaction" or "the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100 (*Stankewitz*).)  "Neither an election nor a unanimity instruction is required when the crime falls within the 'continuous conduct' exception." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882.)

8

"[P]roof of a course of conduct offense will usually consist of evidence of various incidents occurring over a period of time." (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1451.) "A continuous course of conduct, by its nature, may stop and start." (*People v. Rae* (2002) 102 Cal.App.4th 116, 124 (*Rae*).)

1. *Standard of review*

The propriety of a trial court's decision to give or refuse any particular instruction in a case involves a mixed question of law and fact that is a predominantly legal one that should be examined without deference. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) Thus, "assertions of instructional error are reviewed de novo." (*People v. Shaw* (2002) 97 Cal.App.4th 833, 838, citing *Waidla*, *supra*, 22 Cal.4th at p. 733.)

C. *Analysis*

Stewart contends the prosecution's theory of criminal liability as to count 1 was that "the . . . act that resulted in Dakari's death" was: (1) shaking Dakari, (2) slamming Dakari's head against a hard surface, or (3) failure to act (specifically, the failure to call 911). He complains that "[t]he prosecutor never elected to choose which 'act' served as the basis for the [count 1] charge," and the court "never instructed the jury that it must unanimously agree on the act in determining [his] guilt on [count 1]."

As a preliminary matter, we note that, contrary to Stewart's contention, the prosecution did not argue the failure-to-act theory as to count 1. During her closing arguments, the prosecutor told the jury that the People's factual theory of guilt regarding count 1 was that Stewart shook Dakari and slammed him onto a hard surface, causing his skull to fracture. The prosecutor reiterated her argument by telling the jury the evidence

9

showed "that when [Stewart] acted, *did the act of shaking, slamming*, that a reasonable person would have understood that those acts, the nature of those acts would directly and probably result in great bodily injury."  (Italics added.)  Soon thereafter the prosecutor again reiterated her argument by stating that "the act that the People are alleging is *the act of shaking, the act of slamming*."  (Italics added.)

The record also shows the prosecution presented the failure-to-act evidence to prove Stewart's guilt of the count 2 offense of willfully causing injury to Dakari in violation of section 273a(a).  In her rebuttal argument the prosecutor focused not on count 1, but on the negligence element of count 2, arguing that, "[a]s far as [Stewart's] negligence goes, it's not just about not calling 9-1-1"; he "took the time and he bothered to put that beanie on [Dakari] when he noticed a bump [on Dakari's head]"; and he never told anybody about Dakari's injury.

We conclude the court was not required to give a unanimity instruction with respect to count 1 because Stewart's alleged acts of shaking and slamming Dakari constituted a continuous course of conduct, and thus the court did not commit instructional error by failing to give such an instruction.  Here, Dakari's mother, K.P., testified that on the day of the incident in question, she left Stewart alone in their apartment with Dakari and his sibling at around 9:00 a.m. while she went to the grocery store across the street from the apartment complex.  K.P. also testified that she left the store to return home about 37 minutes after she left the apartment.  Thus, the evidence shows Dakari was under Stewart's care in the same location for a little more than 37 minutes.

10

In addition, Stewart acknowledged during his video-recorded and transcribed interview by the police that, during that short period of time, he caused Dakari's head to "go back and forth pretty violently" to the point that Dakari's eyes rolled back. The transcript of the interview shows that the following exchange occurred between Detective King and Stewart:

> "[Stewart]: Sir, I was in the room and [Dakari] was crying. I was going like this.
>
> "[Detective King]: Okay. See that—
>
> "[Stewart]: But I did not—
>
> "[Detective King]:—makes a little more sense.
>
> "[Stewart]: —I did not do this. I didn't do this. I was like this.
>
> "[Detective King]: Okay. *But you were shaking his head back and forth pretty violently . . . .* [¶] . . .
>
> "[Stewart]: I wasn't going like this. This is (unintelligible).
>
> "[Detective King]: I'm not saying . . . you had . . . your hands like that, but *you were causing his head to go back and forth pretty violently.*
>
> "[Stewart]: *Yeah, by patin' [sic] and goin' like* (thumping sound)—*like that.*
>
> "[Detective King]: Okay.
>
> "[Stewart]: Tryin' to get him rockin' like, eh, be quiet. Jeez, be quiet.
>
> "[Detective King]: Okay. *So you were rocking his head back and forth pretty violently?*
>
> "[Stewart]: *Yeah, but I didn't—no, not like this. You make it seem like—*

11

"[Detective King]: TRAVON. TRAVON—

"[Stewart]: You make it seem like I—I was doin' this intentionally."

Shortly thereafter the following exchange took place:

"[Detective King]: "You shook that head back and forth violent enough to cause those injuries. You did. Okay. That's all I care about, the why? I mean, were you—were you stressed?

"[Stewart]: "No, I was—he was crying. I'm trying to get him quiet.

"[Detective King]: And you were . . . stressed. Were you stressed or not?

"[Stewart]: Yeah. I wasn't angry."

The expert medical testimony presented by the prosecution showed that an impact to Dakari's head caused scalp swelling and the fracture of his skull and that some sort of shaking was involved. It also demonstrated that Dakari had hemorrhages around the optic nerve of both eyes, the hemorrhaging went through multiple layers of his left eye and this type of hemorrhaging typically is seen in trauma deaths. Dr. Trenkle, the forensic pathologist who performed an autopsy on Dakari, opined that Dakari's death was an intentional homicide.

From the foregoing evidence, we conclude that the acts on which the prosecution relied in arguing Stewart was guilty of count 1—the shaking of Dakari and the slamming of Dakari's head against a hard surface during the short period of time Dakari was in Stewart's care in the apartment while K.P. was across the street shopping—were "so closely connected as to form part of one transaction" (*Stankewitz*, *supra*, 51 Cal.3d at p. 100) within the meaning of the continuous-course-of-conduct rule. As shown by defense

12

counsel's closing arguments, Stewart tendered essentially the same defense to each of the two alleged assaults: he did not intentionally shake Dakari, and he did not intentionally inflict the baby's head trauma.

Stewart's reliance on *People v. Hernandez* (2013) 217 Cal.App.4th 559, is unavailing. The *Hernandez* court explained that "a continuous course of conduct exists when the *same actor* performs the *same type of conduct* at the *same place* within a *short period of time*, such that a jury cannot reasonably distinguish different instances of conduct." (*Id*. at p. 573, italics added.) *Hernandez* is distinguishable because it involved two charged acts that did not constitute one continuous course of conduct because they were separated by time and space: the defendant's alleged possession of a firearm at the domestic violence victim's house and his alleged subsequent possession of a firearm hidden in his car at another location. (*Id*. at pp. 570-571, 576.) Here, the continuous course of conduct exception applies because the prosecution's evidence showed that "the same actor [(Stewart)] perform[ed] the same type of conduct [(shaking and slamming Dakari)] at the same place [(Stewart and K.P.'s apartment)] within a short period of time [(a little more than 37 minutes)], such that a jury [could not] reasonably distinguish different instances of conduct." (*Id*. at p. 573.)

For all of the foregoing reasons, we conclude the court did not err in failing to give, sua sponte, a unanimity instruction as to count 1.

## II. *SECOND CLAIM OF COUNT 1 INSTRUCTIONAL ERROR*

Stewart next claims that his count 1 conviction of child assault homicide should be reversed because the court's "erroneous instruction on the assault element of the count 1

13

offense, coupled with the prosecutor's legally erroneous theory of culpability and the court's inadequate answer to the jury's question on willfulness, violated due process." In support of this claim, Stewart asserts that (1) the court instructed the jury under CALCRIM No. 820 on the elements of count 1, but it did not define the terms "application of force" and "apply force" used in that instruction, and it thereby "allowed the jury to find [count 1] true without ever finding [that he] assaulted Dakari"; (2) the prosecutor presented a legally erroneous theory of culpability by telling the jury he could be found guilty of count 1 "for the 'act' of failing to call 911"; and (3) when the jury asked for a definition of the term "willfully" used in CALCRIM No. 820, the court "compounded the error" by referring the jury back to the instructions, including CALCRIM No. 820.

Stewart's claim of count 1 instructional and cumulative error is unavailing.

A.  *Background*

1.  *CALCRIM No. 820*

The court instructed the jury on the elements of count 1 by giving the following modified version of CALCRIM No. 820:

> "The defendant is charged in Count 1 with killing a child under the age of 8 by assaulting the child with force likely to produce great bodily injury.
>
> "To prove that the defendant is guilty of this crime, the People must prove that:
>
> "1.  The defendant had care or custody of a child who was under the age of 8;

14

"2.  The defendant did an act that by its nature would directly and probably result in the *application of force* to the child;

"3.  The defendant did that act *willfully*;

"4.  The force used was likely to produce great bodily injury;

"5.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child;

"6.  When the defendant acted, he had the present ability to *apply force* likely to produce great bodily injury to the child;

"AND

"7.  The defendant's act caused the child's death[.]

"Someone commits an act *willfully* when he or she does it willingly or on purpose.  It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"An act *causes death* if:

"1.  The death was the natural and probable consequence of the act;

"2.  The act was a direct and substantial factor in causing the death;

"AND

"3.  The death would not have happened without the act.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that caused the death."  (First, second and third italics added.)

2. *Jury's request for a definition of "willfully"*

During deliberations the jury foreperson sent the following note to the court, requesting a definition of the term "willingly": "Can we get a better or clearer definition of the word: '*willfully*' and possibly some examples of that definition." (Italics added.)

The court's written response stated: "Please refer to all of the instructions, including [CALCRIM No.] 820."

B. *Analysis*

Stewart's claim of count 1 instructional error is premised in part on his contention that, when the court instructed the jury under CALCRIM No. 820 on the elements of count 1, it did not define the terms "application of force" and "apply force" used in that instruction. The Attorney General asserts that Stewart forfeited his claim "because he did not request any clarifying instructions to define [those] terms." We agree.

Our Supreme Court has explained that, "'[g]enerally, a party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 (*Guiuan*), italics added.)

Here, Stewart does not challenge the correctness of CALCRIM No. 820. Rather, he complains that the instruction was too general and the court should have provided a clarifying instruction that would have given the jury additional guidance on the meaning of the terms "application of force" and "apply force" used in that instruction. Stewart

does not dispute that he failed to request a clarifying instruction regarding the meaning of those terms, which he characterizes as "critical elements" of count 1.

Thus, we conclude Stewart forfeited his claim of instructional error because he did not request that the court give a clarifying instruction on the meaning of those terms. (*Guiuan*, *supra*, 18 Cal.4th at p. 570; *People v. Valdez* (2004) 32 Cal.4th 73, 113 (*Valdez*) ["Defendant did not request the clarifying language he now contends was crucial and may not now 'complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete.'"].)

Stewart's claim of count 1 error is also premised on his contention that the prosecutor presented a "legally erroneous" theory of count 1 culpability by telling the jury he could be found guilty of count 1 by failing to call 911. However, we have already concluded that the prosecutor did *not* argue the failure-to-act theory as to count 1. As we discussed, *ante*, the record shows that the prosecution presented the failure-to-act evidence to prove Stewart's guilt of the *count 2* offense of willfully causing injury to Dakari in violation of section 273a(a).

Stewart also asserts that, when the jury asked for a better or clearer definition of the term "willfully" used in CALCRIM No. 820, the court "compounded the error" by referring the jury back to the instructions, including CALCRIM No. 820. This contention is unavailing. "Where the original instructions are themselves full and complete, the

17

court has discretion under section 1138[5] to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97; accord, *People v. Davis* (1995) 10 Cal.4th 463, 522.)

Here, the version of CALCRIM No. 820 that the court gave to the jury fully and completely defined the term "willfully." Specifically, that instruction informed the jury that "[s]omeone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage." No further definition of the term "willfully" was required. Accordingly, we conclude the court acted within its discretion when it responded to the jury's request for a "better or clearer definition" of the term "willfully" by telling the jury, "Please refer to all of the instructions, including [CALCRIM No.] 820."

### III. *THIRD CLAIM OF COUNT 1 INSTRUCTIONAL ERROR* (*LESSER INCLUDED OFFENSES*)

Stewart also contends the court's prejudicial failure to instruct the jury on simple assault and aggravated assault as lesser included offenses of count 1 (child assault homicide) requires reversal. This contention is unavailing.

---

5    Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

18

A. *Applicable Legal Principles*

1. *Duty to instruct sua sponte on lesser included offenses*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 (*Blair*).) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*Id.* at p. 745; see *People v. DePriest* (2007) 42 Cal.4th 1, 50 (*DePriest*) ["Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense."].)

"To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*Blair*, *supra*, 36 Cal.4th at p. 745; see *People v. Breverman* (1998) 19 Cal.4th 142, 162.) "Substantial evidence" in this context is evidence from which a jury composed of reasonable persons could conclude the defendant *committed the lesser offense but not the greater*. (*Breverman*, at p. 162.) "'In deciding whether evidence is "substantial" in this context, a court determines only its bare legal sufficiency, not its weight.'" (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

19

2. *Lesser included offenses of count 1* (*simple assault & aggravated assault*)

"[S]imple assault (§ 240) is a lesser included offense of child assault homicide (§ 273ab)." (*People v. Wyatt* (2012) 55 Cal.4th 694, 698.) "Section 240 defines the crime of simple assault as 'an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.'" (*Wyatt*, at p. 702.) To be guilty of simple assault, a defendant "must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct." (*People v. Williams* (2001) 26 Cal.4th 779, 788.)

Aggravated assault (assault by means of force likely to produce great bodily injury in violation of section 245) is also a lesser included offense of child assault homicide. (*People v. Basuta* (2001) 94 Cal.App.4th 370, 392.) Section 245, subdivision (a)(1), provides in pertinent part that "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison . . . ." Both sections 273ab and 245, subdivision (a)(1) "require an assault by means of force likely to cause great bodily injury. Section 273ab, however, has the additional element that the assault result in death." (*Basuta*, at p. 391.)

3. *Standard of review*

We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

B. *Analysis*

Stewart claims his conviction of child assault homicide should be reversed because (1) there is substantial evidence from which reasonable jurors could have found

20

him guilty of simple assault or aggravated assault, and not guilty of child assault homicide; and, thus (2) the court prejudicially erred by failing to instruct the jury, sua sponte, on the lesser included offenses of simple assault and aggravated assault.

Specifically, Stewart contends the court was required to instruct the jury on *simple assault* "because there was sufficient evidence from which the jury could find that [he] was not aware of facts that would lead a reasonable person to realize that great bodily injury would naturally and probably result from the act of rocking Dakari." In support of this contention, Stewart relies on evidence showing he told the police during his interview that he accidentally dropped Dakari and also "rocked" him until he quieted. Stewart also relies on the testimony of the defense expert, Dr. Orphoven, who (Stewart asserts) "explained that of the numerous cases she examined in which a child was shaken, she observed visible injuries to the nerves and ligaments in the spinal chord and brain stem," but "none of these injuries occurred in this case."

Stewart also contends the court was required to instruct the jury on *aggravated assault* because, although the jury could have found that his act of rocking Dakari was assaultive and likely to result in great bodily injury, reasonable jurors could have found this assault did not result in Dakari's death. Stewart again relies on the testimony of Dr. Orphoven, who (Stewart asserts) "testified to this precise fact: Dakari died from the blunt-force injury caused by [a] fall, not from any 'shaking.'"

In response, the Attorney General maintains the court did not commit instructional error because "[n]o evidence was presented demonstrating the crime was anything less than charged" and, thus, the evidence was insufficient to support jury instructions on

21

simple and aggravated assault.  The Attorney General also argues that Stewart has failed to establish that any such error was prejudicial.

We shall assume, without deciding, that the court erred by failing to instruct the jury, sua sponte, on the lesser included offenses of simple assault and aggravated assault. The People urge us to conclude that Stewart has failed to establish that any such error was prejudicial under the *Watson* test for prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), which our Supreme Court, in *People v. Breverman* (1998) 19 Cal.4th 142, made applicable to instructional errors of this sort in noncapital cases.  (See *People v. Moye* (2009) 47 Cal.4th 537, 555.)

Under the *Watson* test, an error in failing sua sponte to instruct on a lesser included offense requires reversal of the conviction for the greater offense "if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred."  (*Breverman*, *supra*, 19 Cal.4th at p. 178.)  Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility."  (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.) *Breverman* explained that appellate review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively*

22

weak, that there is no reasonable probability the error of which the defendant complains affected the result."  (*Breverman*, at p. 177.)

Applying the *Watson* harmless error test, we conclude Stewart has failed to meet his burden of showing a reasonable probability that he would have obtained a more favorable outcome had the court instructed the jury on simple assault and aggravated assault as lesser included offenses of the child assault homicide offense charged in count 1.  The four elements of child assault homicide (§ 273ab) are:  "(1) A person, having the care or custody of a child under the age of eight; (2) assaults this child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death."  (*People v. Malfavon* (2002) 102 Cal.App.4th 727, 735, citing § 273ab.[6])

Here, as shown by his trial counsel's closing argument, Stewart's principal defense to count 1 was that he accidentally dropped Dakari onto the bathroom floor, and the prosecutor failed to prove that the accident caused Dakari's death.[7]

---

[6]    Section 273ab, subdivision (a), provides in full:  "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life.  Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187 or Section 189."

[7]    Defense counsel argued that "[w]e know [Stewart] dropped his son.  What we don't know was did that actually inflict all of the injuries, all of the damages?  Did that accident cause the death?  We don't know."  Referring to Dr. Orphoven's testimony for the defense, Stewart's counsel argued that Dr. Orphoven "said, look, this is consistent with an accident."

Regarding the first element of count 1, it is undisputed that Stewart had care or custody of his two-month old son, Dakari, on March 3 while Dakari's mother went shopping at the grocery store across the street from their apartment.

Regarding the second element of count 1, the prosecution presented overwhelming evidence that Stewart assaulted Dakari by violently shaking him and slamming his head into a hard surface. During his video-recorded and transcribed police interview (see fn. 5, *ante*), Stewart stated he "rocked [Dakari] hard," and he admitted he caused the baby's head to "go back and forth pretty violently" to the point that Dakari's eyes rolled back. During the interview Stewart also acknowledged that he "lied to [the interviewing officer] right there" when he told the officer he dropped Dakari—to whom he deceptively referred as his "cousin"—on the carpet in the hallway. The officer challenged Stewart's story by telling him, "I know what kind of force and what kind of hard object had to strike Dakari's skull to break it." Stewart changed his story by claiming he "slipped" and accidentally dropped Dakari on the bathroom floor. However, Dr. Trenkle, the forensic pathologist who performed the autopsy on Dakari, testified that Dakari's death was an intentionally-inflicted homicide. Dr. Trenkle based his opinion on the fact that (among other things) Dakari had a one-centimeter-wide four-inch-long skull fracture that ran from the right side parietal bone above the ear to the occipital bone at the back of the head, and the bleeding between the dura and the brain indicated Dakari had suffered trauma from a moving head injury.

With respect to the third element of count 1, the testimony of the prosecution's medical experts (Drs. Massi & Trenkle) regarding the severity of Dakari's injuries

24

established that Stewart used force that, to a reasonable person, would be likely to produce great bodily injury. As discussed more fully in the factual background, *ante*, the strong expert testimony presented by the prosecution showed Dakari had a wide four-inch-long fracture on his skull, he suffered bleeding between the dura and the brain, his scalp was visibly swollen, his brain was severely swollen, and he had bleeding around the optic nerve of both eyes with the hemorrhaging going through multiple layers of his left eye. The expert testimony also showed the edges of Dakari's retina were folded upward, which is consistent with child abuse where the baby has been shaken, and Dakari died from intentionally-inflicted injuries.

Last, regarding the fourth element of count 1, there is no dispute that Dakari's death resulted from the head injuries he suffered.

In addition, overwhelming evidence established that Stewart's behavior demonstrated consciousness of guilt. That Stewart was aware of the severity of Dakari's injuries is established by the evidence showing he tried to conceal the injury to Dakari's head by placing a beanie over the baby's head before K.P. returned to the apartment. During the police interview, Stewart admitted he saw a knot on Dakari's head, and he told the officer he tried to hide it and cover it up by putting a beanie on Dakari's head "so [K.P.] wouldn't know" that he "caused the knot on [Dakari's] head" when she returned home from the grocery store. It is undisputed that Stewart did not seek medical assistance. K.P. called 911. Stewart said nothing about Dakari's head injury to the emergency medical personnel who responded to K.P.'s 911 call and tried to save Dakari's life.

25

The evidence also establishes that Stewart again exhibited consciousness of guilt when he repeatedly lied during the police interview by telling the officer that Dakari was his cousin. When the officer asked where Dakari's father was, Stewart falsely answered, "I have no idea." Stewart also told the officer Dakari's father did not have a relationship with K.P., she and Dakari's father had had a "one-night stand," and K.P. was "easy."

Stewart also demonstrated consciousness of guilt during the interview by repeatedly lying about how Dakari was injured. First, he claimed Dakari "crack[ed]" his head on his baby tub while "moving and jerking" during a bath. When the officer pointed out that a baby would not hit his head on a baby tub to the point of cracking his skull, Stewart changed his story and indicated that Dakari's head hit the actual tub, not the baby tub. The officer explained that a two-month old baby would be unable to sustain that type of injury from flailing around in a bathtub. Stewart then changed his story again and told the officer he dropped Dakari "hard" on the carpet in the hallway. As already noted, when the officer said that a short fall on a soft carpet would not cause a skull fracture, Stewart admitted he "lied . . . right there" when he said he dropped Dakari in the hallway, and he then claimed he dropped Dakari by the toilet on the bathroom floor.

For all of the foregoing reasons, we conclude Stewart has failed to show the court prejudicially erred by failing to sua sponte instruct the jury on the lesser included offenses of simple and aggravated assault. He has not demonstrated that, but for the assumed instructional error, the jury would have convicted him of either simple assault or aggravated assault, but it would not have convicted him of child assault homicide.

## IV. *DENIAL OF STEWART'S MISTRIAL MOTION*

Stewart also contends the court abused its discretion by denying his motion for a mistrial after the prosecutor questioned the defense expert, Dr. Orphoven, about what Stewart claims was evidence of old rib injuries that had been excluded by an in limine ruling. We reject this contention.

A. *Background*

1. *First trial and mistrial*

Stewart had two trials in this case. Before the first trial began, the court granted a defense motion in limine to exclude evidence related to any old rib fractures that Dakari may have suffered. During the first trial the court declared a mistrial after one of the prosecution's medical experts, Dr. Trenkle, indicated that Dakari had suffered two rib fractures that were healing at the time of his death.

2. *Second trial and denial of Stewart's new motion for a mistrial*

Before the second trial commenced, Stewart made a motion in limine (in limine motion No. 1) to dismiss the case or, alternatively, to preclude the People from introducing evidence that Dakari may have suffered fractured ribs and wrists. The motion was based on the People's alleged failure to preserve exculpatory evidence. The court denied that motion.

Stewart also brought a motion in limine (in limine motion No. 8) to preclude the prosecution from presenting evidence that Dakari may have suffered old or healing rib injuries of unknown age, origin, and cause. (1CT 202:3-7; 1RT 93:6-8) The prosecutor indicated she had no objection to that motion, but she argued the ruling should apply to

27

both the prosecution and the defense and, if the defense expert mentioned such injuries, the prosecution should be allowed to bring witnesses to testify about the injuries. The court granted the motion because such evidence might suggest Dakari had suffered prior abuse.

During the trial, the prosecutor asked Dr. Orphoven on cross-examination: "Now, did you also note that Dakari had *rib fractures* in this case?" (Italics added.) Before Dr. Orphoven answered that question, defense counsel objected and the court discussed the objection off the record. The prosecutor then moved on to a different line of questioning and Dr. Orphoven did not answer the question about rib fractures.

Shortly thereafter, during a recess and outside the presence of the jury, the court addressed defense counsel's objection to the prosecutor's unanswered question. After noting that it had reviewed the defense in limine motions and its rulings on those motions, the court stated that it was "clear that there was no exclusion of discussion about fractured ribs, wrists or other bones." The court also stated that "[t]he only issue was whether or not there would be testimony about older healing fractures." The court explained that the basis for its rulings was "to avoid any implication or inference that there had been prior instances of abuse to [Dakari]." Finding that the People were "free to introduce evidence of fractured ribs and wrists," the court clarified that, in light of its ruling granting the defense's in limine motion No. 8, the prosecution could not refer to "old or healing injuries." The court added that there had been no specific request in either the first trial or the second trial "to exclude all testimony about fractures to the ribs, to the wrists or anywhere." Shortly thereafter, the court reiterated that the in limine rulings did

28

not exclude evidence of all fractures, stating that the evidence was "limited in the characterization, at least age characterization of the fractures or injuries. And the basis of that was to eliminate any inference or implication that there was prior abuse to this child. *It wasn't to eliminate the ability to discuss current injuries*. Which were fractures either to the ribs or to the wrists." (Italics added.)

Still outside of the presence of the jury, Dr. Orphoven took the stand and indicated that Dakari's rib fractures were old injuries. After Dr. Orphoven stepped down, the court told counsel:

> "It was clear in the court's mind when it made its rulings that *there would be no overall exclusion of testimony of fractured ribs and wrists*. And that [is] based on its denial of the motion in limine [No. 1], which the court, just for the record, denied on both occasions. We specifically again addressed the issue of old and healing fractures or old and healing injuries of unknown age, origin and cause. Because of the implications that it may suggest prior abuse. That was in limine motion [No. 8] made by [defense counsel], [the] motion to preclude the [People] and their witnesses from testifying about ['old'] or ['healing'] injuries of unknown age and origin." (Italics added.)

The court then affirmed its prior in limine rulings and ruled it would allow testimony about any "fresh or current injuries" Dakari suffered on March 3:

> "In review of the transcript it appears that there is going to be a dispute between the experts regarding the nature and extent of those injuries. . . . [¶] If there is testimony about fresh or current injuries having occurred on March 3rd[,] it is the court's intention to allow that testimony. . . . So the court's prior [rulings] will stand."

The court added that it would revisit its ruling if the parties wished to reargue the matter either after the prosecution experts, Drs. Massi and Trenkle, testified, or "pursuant

29

to [an Evidence Code section] 402 [hearing] regarding the issue of the freshness or currentness of the rib fracture injuries."

The prosecutor thereafter continued her cross-examination of Dr. Orphoven in the presence of the jury. However, she did not resume her questioning of Dr. Orphoven regarding rib fractures.

The next day, following an in-chambers conference and outside the presence of the jury, the prosecutor indicated that, based on overnight telephone conversations with Dr. Massi and Dr. Trenkle, the People no longer intended to inquire about any of Dakari's rib or wrist fractures.

a. *Mistrial motion*

Shortly thereafter, defense counsel moved for a mistrial. In support of the motion, Stewart's counsel asserted that, although he did not believe the prosecutor intentionally violated the court's in limine rulings, "[a]t least a couple of the jurors[,] according to Dr. Orphoven, looked at her very sharply. Seemed to be a big deal to them. Since it is being excluded[,] I would be asking for a mistrial at this time, undue prejudice from hearing that, and submit."

The court denied the mistrial motion, finding that "[t]here [was] no overt attempt by [the prosecutor] to elicit testimony [from Dr. Orphoven] regarding excluded evidence. In fact, the court indicated specifically it would include certain evidence in its denial of the [defense's] in limine motion [No. 1]."

30

B. *Standard of Review*

A trial court should grant a motion for mistrial "'only when a party's chances of receiving a fair trial have been irreparably damaged.'" (*People v. Clark* (2011) 52 Cal.4th 856, 990 (*Clark*).)  The determination of "[w]hether a particular incident is incurably prejudicial [that it warrants a mistrial] requires a nuanced, fact-based analysis" that is best performed by the trial court.  (*People v. Chatman* (2006) 38 Cal.4th 344, 369-370.)

We review a trial court's order denying a motion for mistrial under the deferential abuse of discretion standard.  (*Clark*, *supra*, 52 Cal.4th at p. 990.)  "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 (*Guerra*).)

C. *Analysis*

We conclude the court acted well within its broad legal discretion when it denied Stewart's mistrial motion, because the record (discussed, *ante*) establishes the prosecutor did not violate the court's in limine rulings when she asked the defense expert, Dr. Orphoven, on cross-examination:  "Now, did you also note that Dakari had rib fractures in this case?"  As noted above, defense counsel immediately objected before Dr. Orphoven answered that question, the court discussed the objection off the record, the prosecutor moved on to a different line of questioning, and Dr. Orphoven never answered the question as to which Stewart's counsel had objected.  After reviewing the defense in limine motions and the court's prior rulings, the court specifically found that the People

31

were "free to introduce evidence of fractured ribs and wrists," and clarified that, in light of its ruling granting the defense's in limine motion No. 8, the prosecution could not refer to "old or healing injuries." The prosecutor's question did not refer to "old or healing injuries." Thus, we conclude that reversal of the judgment is not required because Stewart has failed to meet his burden of demonstrating that the court, in denying his mistrial motion, exercised its discretion in an arbitrary, capricious, or patently absurd manner. (*Guerra*, *supra,* 37 Cal.4th at p. 1113.)

Even if we were to assume the court abused its discretion in denying Stewart's mistrial motion, we would conclude that reversal of the judgment is not required because Stewart has not met, and cannot meet, his additional burden of demonstrating that any such error "resulted in a manifest miscarriage of justice" (*Guerra*, *supra,* 37 Cal.4th at p. 1113) because it is undisputed that Dr. Orphoven never answered the prosecutor's question about rib fractures. Also, as the Attorney General correctly points out, the court instructed the jury that "[n]othing that the attorneys say is evidence" and that it must "not guess what the answer might have been" if "[a] witness does not answer" a question. Specifically, the court instructed the jury as follows under CALCRIM No. 104:

> "*Nothing that the attorneys say is evidence*. In their opening statements and closing arguments the attorneys will discuss the case, but their remarks are not evidence. Only the witnesses' answers are evidence. [¶] The attorneys' questions are significant only if they help you understand the witnesses' answers. Do not assume that something is true just because one of the attorneys asks a question that suggests it is true. [¶] During the trial the attorneys may object to questions asked of a witness. I will rule on the objections according to the law. If I sustain an objection, the witness will not be permitted to answer, and you must ignore the question. *If the witness does not answer, do not guess what the answer might have*

*been* or why I ruled as I did. If I order testimony stricken from the record, you must disregard it, and you must not consider that testimony for any purpose." (Italics added.)

The court also gave similar instructions under CALCRIM No. 222.

Absent a showing to the contrary, we assume the jury understood and followed the instructions given. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions."].) Here, as there is no showing to the contrary, we assume the jury understood and followed the instructions the court properly gave under CALCRIM Nos. 104 and 222. (*Mickey*, at p. 689, fn. 17.) In sum, we conclude the court properly denied Stewart's mistrial motion.

## V. *PROSECUTORIAL MISCONDUCT* (*COUNT 1*)

Stewart also contends his conviction of count 1 must be reversed because the prosecutor committed misconduct three times, and thereby violated his constitutional right to due process by rendering the trial fundamentally unfair. Specifically, he contends reversal is required because the prosecutor "engaged in a misconduct trifecta" by (1) questioning the defense expert, Dr. Orphoven, about excluded evidence of old or healing rib injuries in violation of the court's in limine rulings; (2) advancing an improper theory of culpability; and (3) presenting a "patently false" closing argument by telling the jury that prosecution witness Dr. Massi had no vested interest in this case.

The Attorney General argues that all three of Stewart's claims of prosecutorial misconduct fail on the merits. The Attorney General also argues that Stewart is barred under the forfeiture rule from raising his second and third claims of prosecutorial

33

misconduct on appeal because he failed to raise them at trial. Anticipating the forfeiture argument, Stewart maintains that, if this court determines he waived his second and third misconduct claims, his trial counsel's failure to raise those claims at trial deprived Stewart of the effective assistance of counsel.

We conclude Stewart's claims of prosecutorial misconduct fail on the merits.

A. *Applicable Legal Principles*

"To constitute a violation under the federal Constitution, prosecutorial misconduct must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" (*Valdez, supra,* 32 Cal.4th at p. 122, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) However, conduct that does not render a criminal trial fundamentally unfair violates a defendant's state law due process rights only if the prosecutor used deceptive or reprehensible methods to persuade the jury. (*People v. Earp* (1999) 20 Cal.4th 826, 858.)

The trial court ordinarily grants a prosecutor wide latitude during argument (*People v. Wharton* (1991) 53 Cal.3d 522, 567), and an allegedly improper remark must be viewed in the context of the closing argument as a whole. (*People v. Lucas* (1995) 12 Cal.4th 415, 475.) However, while a prosecutor may argue all reasonable inferences from the record, she may not mislead the jury. (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758.)

When the misconduct issues focus on comments the prosecutor made before the jury, the question is whether there is a reasonable likelihood the jury construed or applied

34

any of the comments in an objectionable fashion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.)

A defendant may not complain of prosecutorial misconduct on appeal unless he objected on that ground in a timely fashion and also requested that the jury be admonished to disregard the perceived impropriety. (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) The California Supreme Court has explained that "[t]he primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice. [Citation.] Obviously, that purpose can be served only if defendant is required to, and does, raise any objection before the jury retires." (*People v. Williams* (1997) 16 Cal.4th 153, 254.)

"A defendant's conviction will not be reversed . . . for prosecutorial misconduct unless it is reasonably probable a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).)

B. *Analysis*

We conclude that each of Stewart's three claims of prosecutorial misconduct fails on the merits. Thus, we need not, and do not, reach the merits of the Attorney General's argument that Stewart forfeited his second and third misconduct claims.

1. *First claim of prosecutorial misconduct*

As noted, Stewart first claims that the prosecutor committed misconduct by questioning defense expert Dr. Orphoven about excluded evidence of old or healing rib injuries in violation of the court's in limine rulings. We reject this claim because we have

35

already concluded that the record establishes the prosecutor did *not* violate the court's in limine rulings when she asked Dr. Orphoven the following unanswered question on cross-examination: "Now, did you also note that Dakari had rib fractures in this case?"

2. *Second claim*

Stewart also claims the prosecutor committed misconduct by advancing an improper theory of culpability by urging the jury to convict him of count 1 based on his failure to call 911. We reject this claim because we have already concluded that the record establishes the prosecutor did not argue the failure-to-act theory as to count 1; she presented the failure-to-act evidence to prove Stewart's guilt of the count 2 offense of willfully causing injury to Dakari in violation of section 273a(a).

3. *Third claim*

Last, Stewart claims the prosecutor committed misconduct by presenting a "patently false" closing argument concerning the credibility of the expert witnesses. Specifically, he claims the prosecutor improperly told the jury (1) that prosecution witness Dr. Massi had no vested interest in this case, and (2) that defense expert Dr. Orphoven did have a vested interest in this case because the defense hired her and she would do whatever was necessary to help the defense to keep that money coming in.

In support of this claim, Stewart asserts the prosecutor's statement that Dr. Massi had no vested interest in this case was factually incorrect because "the prosecutor's office was paying Dr. Massi's hospital for his testimony." Stewart asserts that "[t]he record also indicates that [Dr.] Massi's hospital apparently profited from this case in yet another way. Defense counsel's questions in cross-examining [Dr.] Massi indicate an organ recovery

36

company paid the hospital's bills, which included the five days Dakari spent on a ventilator to allow the company time to recover the organs." Stewart acknowledges, however, that the jury never heard any evidence regarding this matter because the court sustained the prosecutor's objections to defense counsel's questions about it.

We conclude that Stewart's third claim of prosecutorial misconduct fails because, even if we were to agree the prosecutor's statement about Dr. Massi was factually incorrect, Stewart has failed to meet his burden of demonstrating that such misconduct infected the trial with such unfairness as to make his count 1 conviction a denial of due process (*Valdez*, *supra*, 32 Cal.4th at p. 122); that it is reasonably probable he would have obtained a more favorable result without such misconduct (*Crew*, *supra*, 31 Cal.4th at p. 839). We have already concluded that the evidence of Stewart's guilt (discussed, *ante*) is overwhelming with respect to count 1.

## VI. *CALCRIM NO. 362* (*CONSCIOUSNESS OF GUILT*)

Next, Stewart contends his conviction of child assault homicide must be reversed because the court erred by instructing the jury under CALCRIM No. 362, which is the standard instruction that outlines the permissible inference of consciousness of guilt that may be drawn from a defendant's willfully false pretrial statements relating to the charged crime. He contends CALCRIM No. 362 is a "one-sided" instruction that "violate[s] Due Process." We reject these contentions.

Without an objection from the defense, the court instructed the jury under CALCRIM No. 362 that, "[i]f the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to

37

mislead, that conduct may show he was *aware of his guilt* of the crime and you may consider it in determining his guilt." (Italics added.) The court's instruction also included the following limiting language contained in CALCRIM No. 362: "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement *cannot prove guilt by itself.*" (Italics added.)

In support of his claim of instructional error, Stewart asserts that "the jury heard *powerful* evidence of [his] post-incident conduct that pointed towards his innocence, including evidence that [he] (1) desperately tried to find help for Dakari, (2) went to the hospital, (3) voluntarily agreed to go to the police station to give a statement, and (4) waived his *Miranda*[8] rights and agreed to continue talking to police even after he was told he would be going to jail." Stewart acknowledges the court's instruction properly told the jury that, if it found he made false statements that were intended to mislead, it could consider that conduct as a factor tending to prove he was guilty.

Stewart contends, however, that the court's CALCRIM No. 362 instruction was a "one-sided" instruction that improperly "convey[ed] the state's theory" and violated due process because it did not tell the jury it could consider his post-incident conduct as a factor tending to prove he was not guilty.

8      *Miranda v. Arizona* (1966) 384 U.S. 436.

38

We reject this contention and conclude the court did not err by instructing the jury under CALCRIM No. 362. CALCRIM No. 362 is the successor to CALJIC No. 2.03.[9] (*McGowan*, *supra*, 160 Cal.App.4th at p. 1103.) As noted, CALCRIM No. 362 specifically informs the jury that evidence showing the defendant made a false or misleading statement relating to the charged crime with knowledge the statement was false or intent to mislead "*cannot prove guilt by itself*." (Italics added.) CALJIC No. 2.03 similarly provided that the defendant's pretrial conduct of "ma[king] a willfully false or deliberately misleading statement" concerning the charged crime was "*not sufficient by itself to prove guilt*." (Italics added; see fn. 10, *ante*.)

Stewart's claim that CALCRIM No. 362 is a "one-sided" instruction that favors the prosecution is unavailing. This instruction plainly informs the jury that evidence showing the defendant made such a statement "cannot prove guilt by itself." (CALCRIM No. 362.) The instruction also informs the jury that, if the jury concludes the defendant made such a statement, it is "up to [the jury] to decide its meaning and importance." (*Ibid*.) We conclude that any reasonable jury would understand from this limiting instruction that it must consider all of the evidence, including evidence (such as the evidence here of what Stewart's characterizes as his "post-incident conduct") that tends to show the defendant is not guilty of the charge offense.

---

9    CALJIC No. 2.03 provided: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, *that conduct is not sufficient by itself to prove guilt*, and its weight and significance, if any, are for you to decide." (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103 (*McGowan*), italics added.)

Our conclusion finds support in *McGowan*, *supra*, 160 Cal.App.4th 1099. In *McGowan*, the court explained that "[t]he California Supreme Court has consistently upheld CALJIC No. 2.03 against various and sundry attacks." (*McGowan*, at p. 1103, fn. 3.) *McGowan* also explained that, "[a]lthough there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 [citation], none is sufficient to undermine our Supreme Court's approval of the language of these instructions. Crucially, CALCRIM No. 362 contains nearly identical language to that [contained in CALJIC No. 2.03]: '[E]vidence that the defendant made such a statement cannot prove guilt by itself.'" (*McGowan*, at p. 1104.)

In light of our conclusion on the merits of Stewart's claim of instructional error, we need not address the Attorney General's arguments that Stewart forfeited his claim "by failing to object to the instruction below," and that, in light of the overwhelming evidence supporting the jury's verdict, Stewart has failed to meet his burden of demonstrating he would have obtained a more favorable outcome had the court not given the CALCRIM No. 362 instruction.

## VII. *CLAIM THAT SECTION 273AB IS UNCONSTITUTIONAL*

Noting that a first degree murder conviction under state law is generally punishable by a prison term of 25 years to life, Stewart claims his count 1 conviction of child assault homicide, for which he was sentenced to a prison term of 25 years to life, must be reversed because that section is "an end run around the due process requirement" that malice aforethought and premeditation must be proven before a defendant is

sentenced to a prison term of 25 years to life in cases where an assault results in the death of a child.

We reject this claim. "[I]t [is] immaterial that the punishment for a violation of section 273ab is the same as first degree murder. The Legislature exercised its prerogative in selecting the range of punishment, and there is no principle of law that precludes the same punishment for different crimes." (*People v. Norman* (2003) 109 Cal.App.4th 221, 228.)

Furthermore, section 273ab is not a murder statute; it is a child abuse homicide statute. (*People v. Norman*, 109 Cal.App.4th at p. 229; *People v. Albritton* (1998) 67 Cal.App.4th 647, 659 ["[I]t is a misnomer to call section 273ab a murder statute[;] it is more akin to a child abuse homicide statute."].) There is no "'viable constitutional reason why the state cannot criminalize such conduct and make it a separate crime when the victims are young children. Considering the purpose of the statute—to protect children at a young age who are particularly vulnerable—there can be no dispute of the gravity of the governmental interest involved." (*Albritton*, at pp. 659-660; *Norman*, at p. 229.) "Due process concerns are not implicated." (*Norman*, at p. 229.)

## VIII. *CLAIM OF CUMULATIVE ERROR*

Last, Stewart claims that even if none of the foregoing claimed errors requires reversal when considered separately, the cumulative effect of the errors deprived him of a fair trial. We reject this contention.

"'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People*

41

*v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  A defendant is "entitled to a fair trial but not a perfect one."  (*Ibid*.)

Here, in light of the overwhelming evidence of Stewart's guilt, any errors that occurred were harmless, whether considered individually or collectively.  Accordingly, we reject Stewart's claim of prejudicial cumulative error.

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

IRION, J.